FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JAN - 2 2008

Stephan Harris, Clerk
Cheyenne

SHARON M. ROSE
Lavery & Rose, P.C.
913 Center Street
P.O. Box 890
Evanston, WY 82931
Phone (307) 444-4200
Fax (307) 444-0559
srose@evanstonlaw.com

Attorney for Plaintiff

### IN THE U.S. DISTRICT COURT

### IN AND FOR THE DISTRICT OF THE STATE OF WYOMING

CIVIL NO. 08 CV 005-B

| | |
|---|---|
| DENNIS WATTS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) |
| OCI WYOMING, LP, | ) |
| | ) |
| **Defendant.** | ) |

### COMPLAINT

COMES NOW, the Plaintiff in the above-entitled matter, by and through his attorney, Sharon M. Rose, of Lavery & Rose, P.C., and for his cause alleges as follows:

### NATURE OF THE ACTION

This is an action under Wyoming state law for breach of employment contract and under federal law, Title I of the Americans with Disabilities Act of 1990 and Title I of the Civil Rights

Receipt # CH4 003526
Summons: X issued
____ not issued

1

Act of 1991, to correct unlawful discriminatory employment practices by the Defendant and to make Plaintiff whole.

## JURISDICTION, VENUE AND PARTIES

1. Federal Question and Supplemental Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. This action is authorized and instituted pursuant to Section 107(a) of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a); and Section 102 of the Civil Rights Act of 1991; 42 U.S.C. § 1981(A). Pendent jurisdiction for Plaintiff's state law claim lies by virtue of 28 U.S.C. § 1367.

2. Pursuant to 28 U.S.C. § 1391 proper venue for this cause of action is the United States District Court for the District of Wyoming. The breach of employment contract and unlawful employment practices complained of herein occurred within the District of Wyoming.

3. All conditions precedent to jurisdiction under § 107(c) of the ADA; 42 U.S.C. § 12117(a) as the same may be applicable to Plaintiff's various causes of action, have occurred or been complied with, to-wit:

(a) The employer's unlawful employment practices commenced on or about May 15, 2006 and continued up to and including the date of Plaintiff's termination from employment, June 1, 2007. Charges of employment discrimination on the basis of disability were filed with the State of Wyoming Department of Labor within one hundred and eighty days (180) of the unlawful employment practice, and the Equal Employment Opportunity Commission ("EEOC") within three hundred (300) days of the commission of the unlawful employment practice alleged herein. The Plaintiff filed a

complaint of disability discrimination with the State of Wyoming Department of Labor and the EEOC on May 29, 2007.

(b)     A Notification of Right to Sue on the disability discrimination charge was received from the EEOC on December 21, 2007.

(c)     This Complaint has been filed within ninety (90) days of receipt of the EEOC's Notification of Right to Sue.

4.      Plaintiff is a citizen of the United States and the State of Wyoming, residing in Rock Springs, Wyoming. Plaintiff is the aggrieved party in this action and is authorized to sue to enforce his private rights by virtue of Section 107(a) of the ADA, 42 U.S.C. § 12117(a).

5.      Defendant OCI Wyoming, LP, hereinafter referred to as "OCI" is a Delaware limited partnership authorized to do business and doing business in the State of Wyoming. OCI operates a trona mine and processing plant in Sweetwater County, Wyoming.

6.      Defendant is a "person" within the meaning of § 101(7) of the ADA, 42 U.S.C. § 12111(7).

7.      Defendant is engaged in an "industry affecting commerce" within the meaning of § 101(7) of the ADA, 42 U.S.C. § 12111(7).

8.      Upon information and belief, Defendant has continuously had and does now have in excess of four hundred (400) employees at its Wyoming facility and is an "employer" within the meaning of § 101(5)(A) of the ADA, 42 U.S.C. § 12111(5)(A).

9.      At all times material hereto, Defendant's agents and employees were acting within the scope of their employment and with the knowledge and consent of Defendant.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

10. Plaintiff incorporates herein by this reference the allegations contained in paragraphs 1 through 9 above.

11. On April 18, 1977, Plaintiff was hired by Defendant to work at its Sweetwater County Facility. Throughout his thirty years of employment with Defendant, Plaintiff held a number of positions and at the time of his termination held the position of Control Board Operator in the Refinery.

12. Plaintiff was well respected by his co-workers and described as a thorough, dedicated and safety conscious employee. In his thirty years of employment with the company he never suffered or caused any significant personal injury or property damage whatsoever.

13. As a Control Board Operator Plaintiff was expected to keep watch on numerous computer screens and the operations of numerous pieces of equipment all at the same time. On or about May 15 2006, Plaintiff made a mistake in the performance of his job. Plaintiff had been instructed not to rotate the kiln as he would normally do. In his prior years of experience as a Control Board Operator, Plaintiff had always rotated the kiln and had done so on this date from force of habit. In addition, not rotating the kiln increases the potential for damage to the kiln so the instruction went against all of Plaintiff' instincts. He had forgotten the instruction from his supervisor as there were many other things going on.

14. When his supervisor found out he had not followed the instructions, he confronted Plaintiff in a loud, intimidating and angry manner in front of his coworkers and then required that he immediately leave the work area. Plaintiff's supervisor then proceeded to

4

chastise him and demand an explanation as to why Plaintiff had rotated the kiln when he had been instructed not to. Plaintiff tried to explain the circumstances to his supervisor but the supervisor would not listen. He kept demanding to know how he could trust Plaintiff to follow his instructions in the future. Plaintiff tried to pacify him with various comments. Each time the supervisor would cut him off and say "Wrong Answer". The supervisor's badgering of Plaintiff proceeded for a period of time and in his continuing attempts to explain himself and why he may have forgotten and rotated the kiln when he had been instructed not to, Plaintiff stated that "maybe it was just old age catching up with him, that sometimes at home he would go into a room to get something and forget what he went in there to get, maybe it was Alzheimer's or maybe it was the fog."

15.  The supervisor then used this innocuous statement to Plaintiff's disadvantage. Plaintiff is informed and believe, and therefore alleges, that the supervisor then reported to other supervisors that Plaintiff "was off his meds" and experiencing "the fog".

16.  Plaintiff was sent home for three days and required to see the company doctor before he would be allowed to return to work. Plaintiff saw the Company doctor who recognized that people make mistakes in their work and indeed mentioned he was aware of far more grievous mistakes being made at the plant. He saw no reason for Plaintiff to remain off work.

17.  When Plaintiff was allowed to return to work he was subjected to continuing scrutiny by this same supervisor. The supervisor repeatedly told Plaintiff that he had better be up to speed on how to run a new unit the company was installing or he would be sent home with

no questions asked. Plaintiff was concerned because he was expected to know this unit but had had very limited exposure to the unit and no actual training on the unit. Other operators were given opportunities to view the unit, but not Plaintiff and one other operator who had also been subjected to this supervisor's scrutiny.

18.   Plaintiff and his coworker complained about this harassment to the Human Resource Personnel, yet no action was taken. Defendant had policies prohibiting harassment, but Defendant failed to follow its own policies. Indeed the supervisor at issue had a history and practice of harassing employees and management was well aware of that history yet failed to enforce its harassment policies with sufficient remedial action to prevent the supervisor from continuing his harassing behavior.

19.   Plaintiff also tried to communicate his concerns directly to the supervisor, but to no avail.

20.   Subsequently, on November 13, 2006, while following all standard operating procedures, the Plaintiff encountered a problem while attempting to pump solids underground. While attempting to pump, Plaintiff encountered very high pump pressure and therefore shut the pump down so as not to cause any damage.

21.   Plaintiff did not cause any property damage whatsoever as a result of this incident, however, the operator on the following shift did cause damage to the pump while attempting the same procedure Plaintiff had attempted. Plaintiff is informed and believes and therefore alleges that that operator is still employed by Defendant. Further, at all times during the operations at issue on November 13, 2006, Plaintiff was working with a field operator who

was not subjected to any disciplinary action for engaging in the same operation.

22.     Nevertheless, on November 14, 2006, Plaintiff's supervisor again marched into the control room and demanded Plaintiff follow him. At that time Plaintiff again tried to defend himself but his supervisor would not listen. Plaintiff was grilled about what had happened. Plaintiff attempted to explain as best he could however due to some inadequacies in Defendant's equipment he could not provide all requested details.

23.     Plaintiff's supervisor then brought up other claimed incidences of errors by Plaintiff, which were in fact simple everyday occurrences that all Control Board Operators encountered.

24.     Plaintiff was then told that he was being sent home again.

25.     At the time Plaintiff was being unjustly accused and sent home, he became extremely distraught while attempting to defend himself. Plaintiff justifiably felt a sense of indignation at Defendant's wrongful conduct and his emotional response to it was just a natural human reaction. Defendant provoked this emotional response and then used it to justify its unlawful treatment of Plaintiff, contending that because he had become so emotional he was no longer mentally fit to perform the job duties and functions of a Control Board Operator and was creating risks of harm to his coworkers.

26.     Thereafter on or about November 30, 2006 Plaintiff was called to a meeting with Defendant's agents and employees. He was told that he had three options, he could take a demotion, he could resign or he could retire. He was told that returning to his salaried position as a Control Board Operator was not an option. Defendant did not give Plaintiff any

explanation of what position they would put him in if he accepted the demotion.

27. Upon being sent home, Plaintiff was still emotionally upset. Plaintiff tried to sort out why he was being forced out of his job when he had done nothing wrong. About this same time, Plaintiff, in consultation with his health care-providers determined that it would be to his benefit to take Family Medical Leave in order to give him time to regain and rebuild his emotional stamina and to heal from a physical condition requiring surgery which had previously been scheduled.

28. While on his leave, Plaintiff kept in contact with appropriate personnel at Defendant's plant, and when Plaintiff received a letter from Defendant requiring him to report directly to the same supervisor who had caused him all the stress, Plaintiff did so.

29. As his condition stabilized and he was closer to being released to return to work by his health care providers, he attempted to explore what position he would be given upon return as a result of the demotion. Defendant never gave him an answer. He decided however that he would give the position a try as he did not want to loose the benefits he had accrued due to his longevity of employment with Defendant.

30. Upon advising his supervisor of his intent to return, he was told that he would need to take an MSHA training class again and undergo a Functional Capacity evaluation. On February 19, 2007 he contacted the company nurse to set up the FCE and was advised that it would be set up through the company doctor. His intent was to return to work on March 1, 2007 and he obtained a release from his health care provider to allow him to do so.

31. After arriving at the company doctor's office and being sent for the FCE, but

before it started, the company doctor advised that FCE was not necessary. It is apparent that Defendant had made their own determination that Plaintiff should not be returned to work. Rather they wanted him to retire or go on Long Term Disability and never really considered putting him back in an hourly position.

32. On March 4, 2007 the Company Doctor called Plaintiff and stated he had talked with Defendant's Human Resource director and he was to contact another person for specifics about his retirement. Consequently, given that the option of returning to an hourly position had been taken away from him, the only choices remaining were resign or retire. Plaintiff elected retirement from Defendant and obtained employment elsewhere.

33. As a direct and proximate result of the aforesaid acts and omissions of Defendant, Plaintiff has suffered loss of earnings and benefits, past and future, loss of earning capacity, emotional distress, humiliation, embarrassment, loss of enjoyment of life all in an amount to be shown according to proof at time of trial and for which damage he should be justly compensated.

34. As a further direct and proximate result of the aforesaid acts and omissions of Defendant, Plaintiff has incurred and will incur attorney's fees and costs herein in an amount yet to be determined.

### COUNT I - BREACH OF CONTRACT

35. Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1-34 above.

36. In 1977 when Plaintiff was hired at the Defendant's Sweetwater facility, the facility was owned by a predecessor in interest. When Plaintiff was hired he was provided with

an employee handbook. The employee handbook gave rise to a contract of employment. The handbook provided that cause for termination was required. The handbook contained a list of rules, the violation of which could result in discipline, including termination.

37. Defendant predecessors used the handbook for a period of time during Plaintiff's employment but subsequently adopted new handbooks deleting or amending provisions regarding cause for discipline and termination.

38. To the extent that the subsequent employee handbooks changed the prior handbook provisions with respect to the need for and type of cause for termination, the handbooks and policy were subsequent unilateral modifications of a material term of the prior contract of employment.

39. Defendant did not have the right to make such a unilateral modifications to the contract, in that it had not included a conspicuous and unambiguous disclaimer and/or reservation of the right to make unilateral modifications in the prior handbooks. Further, Defendant did not provide any additional consideration for such a modification nor did it give any notice of such a modification. Consequently, the original contract that arose from the original Handbook applied and Defendant could only terminate Plaintiff for good cause.

40. Defendant did not have cause to treat Plaintiff in the manner in which it did and which resulted in his constructive discharge. Thus, Defendant's actions in terminating Plaintiff were in breach of contract.

41. As a direct and proximate result of the Breach of Contract by Defendant, Plaintiff has been damaged as set forth above.

## COUNT II
## VIOLATION OF ADA - DISCRIMINATION

42. Plaintiff incorporates herein by this reference the allegations contained in paragraphs 1 through 41 above.

43. Plaintiff is an individual with a "disability" as that term is defined in § 3(2) of the ADA, 42 U.S.C. § 12102(2). More specifically, Plaintiff was regarded as and perceived by Defendant as having such a mental impairment that substantially limited him in a major life activity of working and/or concentrating. Further Defendant contended that because of this perceived disability Plaintiff posed a direct threat of harm to himself as others.

44. Plaintiff is a qualified individual with a disability within the meaning of § 101(8) of the ADA, 42 U.S.C. § 12111(8), in that Plaintiff is an individual with a perceived disability, who, with or without reasonable accommodation, could have performed the essential functions of his job.

45. Defendant's acts and omissions as set forth above are in direct violation of § 102 of the ADA, 42 U.S.C., § 12112 in that Defendant discriminated against Plaintiff on the basis of his perceived disability by, among other things:

(a) in removing Plaintiff from the job site and requiring him to meet with the company doctor before being allowed to return to work in May of 2006,

(b) in failing to use objective evidence and valid medical analyses of Plaintiff's ability to work,

11

(c) in failing to use such objective evidence and valid medical analyses when making it's determination of whether or not Plaintiff was in fact a direct threat to the safety of others.

(d) removing Plaintiff's from the Control Board Operator position and constructively discharging him from employment on the basis that he was a direct threat to himself or others in the workplace.

46.  As a direct and proximate result of Defendant's discriminatory acts, Plaintiff has been damaged as set forth above.

47.  The acts and omissions of Defendant as set forth above amount to an unlawful and intentional violation of Federal laws justifying the award of punitive damages against Defendant in favor of Plaintiff.

WHEREFORE, Plaintiff prays the Court enter judgment in favor of Plaintiff and against Defendant as follows:

1.  For actual damages including back pay and front pay, lost benefits, and lost earning capacity, in an amount to be determined at trial of this matter.

2.  For compensatory damages including emotional distress and loss of enjoyment of life.

3.  For attorney's fees and costs, including legal expenses and costs, incurred in this action.

4.  For Punitive Damages.

5.  For such other and further relief as is just and equitable in the premises.

DATED this 28th day of December, 2007.

                                    Dennis Watts, Plaintiff

BY: *(signature)* Sharon M. Rose
Lavery & Rose, P.C.
P.O. Box 890
Evanston, WY 82931-0890
Attorney for Plaintiff

## JURY DEMAND

The Plaintiff hereby demands a trial by a jury in this matter.

DATED this 28th day of December, 2007.

*(signature)*
Sharon M. Rose

13